Good morning, Your Honors. May it please the Court, frankly appearing on behalf of Appellant Lance Jett, before I begin, I'd like to reserve two minutes of my time for rebuttal. Okay. We'll try and help you, but you also keep track. Will do. Your Honors, Appellant Lance Jett broke his thumb while he was an inmate in the defendant's custody. The defendant's failed to provide the follow-up orthopedic care that an emergency room doctor had prescribed, and as a result, Mr. Jett's thumb healed crooked. He endured three years of pain, and he lost the ability to perform basic functions like buttoning his clothes and holding a pencil. All of this was avoidable, and none of it served any penological purpose. The evidence supported a jury conclusion that Mr. Jett endured this misery because the defendants were deliberately indifferent to his need for medical care. Now, the trial court granted summary judgment for the defendants, and I respectfully submit to you that it did so because it viewed the evidence in the light most favorable to the defendants and not Mr. Jett, as it was required to do on summary judgment. That was error, and it should be reversed. Let me ask you this, and it may or may not be directly relevant to this case. What relationship is, if any, does Mr. Jett have to the class action that's pending in Judge Henderson's court on medical care in the California prisons? Is he a member of that? He must be a member of that class. Your Honor, I'm not aware if he's a member of that class or not. Are you aware of that lawsuit? I'm not familiar with it. Oh, okay. Let me take the errors that I believe the trial court made as to each defendant in turn, and I'll start with Defendant Dr. Penner. There are three instances where I think the trial court viewed the evidence in the light most favorable to the defendants and not Mr. Jett. First, the trial court acknowledged that Mr. Jett should have had his orthopedic visit within one week of his October 27 injury. And it acknowledged that he was harmed. He didn't get that visit, and he was harmed by not getting that visit. The trial court found that Dr. Penner didn't see Mr. Jett until December 24th, which was two months after his injury, and it concluded from that that it wasn't Dr. Penner's fault that Mr. Jett hadn't gotten his orthopedic visit in that interim. The record says otherwise. The record shows that Dr. Penner knew long before December 24th that Mr. Jett needed medical care. He knew about Jett's condition, but he simply didn't act on it. How do we know that? Several reasons, Your Honor. First, Mr. Jett submitted medical slips for at least two months prior to finally seeing Dr. Penner in which he explained his need for medical care, and none of those slips were acted on. On December 8th, so about six weeks after his injury, he actually wrote a letter to Dr. Penner by name stating that he needed care and had at that point, up to that point, been unable to get it. And finally, on December 11th, he submitted a grievance stating that, again, stating his inability to get the care that he needed. There's evidence in the record that Dr. Penner was aware of Jett's condition, and he simply didn't act on it. So taking the evidence in the light most favorable to Mr. Jett, the trial court should have concluded that Dr. Penner delayed two months in providing care that he knew Mr. Jett needed. How much discovery have we had at this point? Mr. Jett served interrogatories and document requests on the defendants. He also attempted to subpoena 18 witnesses who were directly involved with his care or his case. Those subpoenas were disregarded. So up to this point, there's just been his limited written discovery, and the defendants took his deposition. Okay. Do we have anything at all from Dr. Penner at this point? The only thing we have from Dr. Penner is his responses to Mr. Jett's interrogatories. And what does he say about when he first became aware? He doesn't explicitly say when he first became aware. The State argued in its brief that it was December 2001. It's not specific about when that was. He admits that he didn't see Mr. Jett until December 24th. That we've got, and we have the date of the letter on December 8th. Right. Right. However, I think this creates a dispute of fact. There's no doubt that Mr. Jett, the record supports the finding that Mr. Jett was submitting these medical requests starting a week after his injury. He testified to that, and that's not controverted. Dr. Penner should have responded to those requests, and there's certainly a dispute of fact as to whether or not he knew about them. The record, I think, supports that he did. Okay. Let me move on to what I think the second error was the trial court made as to defendant Dr. Penner. It found that Dr. Penner requested an orthopedic appointment for Mr. Jett, and that Mr. Jett ultimately got an orthopedic visit. And it inferred from that, the trial court inferred from that, that Dr. Penner was being responsive to Mr. Jett's needs, and that Dr. Penner's request got Mr. Jett his orthopedic appointment. There's two problems with this inference. The first is that the record shows that Dr. Penner didn't submit his request until March. That was a good two and a half months after he first saw Mr. Jett, and a good four and a half months after Mr. Jett's injury. A jury could infer from this that Dr. Penner knew about Mr. Jett's need for the orthopedic visit. That's in the record that he knew as early, he admits that he knew it, at least as early as December 24th, but he didn't submit it for another two and a half months. A jury could infer from that, or conclude from that, that he delayed getting Jett care that nobody here disputes Mr. Jett needed. And that delay could constitute deliberate indifference. Second, the second problem with this inference that the trial court made on this subject is that there were, the trial court failed to acknowledge that there were two requests for orthopedic appointments in the records. There was Dr. Penner's, which was submitted in March, and then there was a second doctor's that was submitted in April. Dr. Penner's request was labeled routine and omitted that Mr. Jett at that point had been suffering constant pain for months and had lost movement in his thumb. It also stated that Mr. Jett's thumb showed no significant malalignment when Mr. Jett's thumb, according to Mr. Jett's testimony, was visibly out of line. He said he had a hump on his thumb from where the bones weren't lined up properly. And a radiology report confirmed this. A radiology report that Dr. Penner saw said that there was a deformity and an angulation in Mr. Jett's thumb. The second request, by contrast, was labeled urgent, stated that Mr. Jett had decreased range of movement in his thumb, had osteoarthritis and degenerative joint disease, and that he needed treatment options. Dr. Penner's request was out there for at least a month and got no action. He submitted it in March and Dr. and Mr. Jett didn't see an orthopedist until April 19th. The second request was submitted on April 9th, and Mr. Jett saw, as I said, the orthopedist on April 19th. A jury could certainly conclude from this that the second request got Mr. Jett his orthopedic visit and that Penner, Dr. Penner, could have gotten a visit equally as fast if he hadn't put inaccurate statements in his orthopedic request. From this, a jury could conclude that Dr. Penner interfered with and delayed Jett's ability to get the care that another doctor had prescribed. Why don't you address both the warden and the managing physician? Certainly, Your Honor. As well as Penner. The case as to, you're referring to Dr. Peterson? Yes. The cases to Dr. Peterson and Warden Plyler are somewhat simpler because there's no dispute in the record that they didn't do anything to help Mr. Jett. And I don't say that in sort of a partisan way. They didn't do anything. There is a dispute of fact. And, in fact, the trial court acknowledged that there was a dispute of fact as to whether or not they knew about Mr. Jett's condition. Mr. Jett wrote a letter to Dr. Peterson on December 13th. I think we're aware. I think everybody's aware of the facts of the case. So in terms of the record, you've established that. Right. There's a dispute. There's a dispute about whether they got the letter. Isn't that the point? Correct. There is a dispute about whether they got the letter. And on summary judgment, Mr. Jett was entitled to the inference that they had gotten that letter. And if they had gotten their respective letters and they didn't act on them, then they had notice of his condition and they failed to act. That's deliberate indifference. I have one other question on 845.6. They, in fact, took him from the penitentiary to an emergency room. Doesn't that satisfy 845.6? Your Honor, I think there are two issues here. One is, yes, they took him to the emergency room the day he injured his thumb. However, when he went to the emergency room that day, he couldn't have his thumb set because it was too swollen. So the orthopedic care that he needed, he had to get after his initial visit. Isn't that malpractice? It could well be malpractice. But the record shows that the defendants were aware, subjectively aware, of his need for this orthopedic visit and they simply didn't get it to him. And that, I think, shows indifference. You have 1.22 left. Yes. I'd like to reserve the balance of my time for rebuttal. Thank you. Excuse me. May it please the Court. I'm Catherine Woodbridge from the Attorney General's Office representing appellees. I'd like to address a couple points that Appellant brought up. And the first one is when Dr. Penner knew about the appellant's condition. It's undisputed that Mr. Jett did not contact Dr. Penner until December 8th. And that's the only evidence we have. Dr. Penner saw Mr. Jett on December 24th. That's hardly a delay in time. And when Dr. Penner did see Mr. Jett, he ordered x-rays. What do we know about sort of the internal organization of the medical system? That is to say, we know that there's a letter dated December 8th. Correct. From Mr. Jett to Dr. Penner. But we also know that there were prior various forms of slips and so on. Do we know who was likely to get those in the ordinary course of business? No. And there's no evidence. And why don't we know that? Pardon me? And why don't we know that? Well, Dr. Penner is not the chief medical officer, so there would be no evidence that medical issues would go to him. There's no evidence they went to Dr. Peterson. I'm asking a different question. What I'm really driving at is, at this point, we've had minimal discovery. And to ask Mr. Jett to show that Dr. Penner did see, or most likely did see, all these other things prior to the letter is hard to do without a lot more work in terms of, okay, who ordinarily saw the slips that came in and sort of what was the ordinary course of business in the prison? Because it's entirely possible, and I'm just making this up, but it's entirely possible that Dr. Penner was aware of this within a week. I mean, I just don't know. Well, Dr. Penner disputes that, and in his discovery responses, he states that he wasn't aware of any of Mr. Jett's condition until December 24th. However, if you view the light, if you view the evidence in the light most favored of Mr. Jett, he wrote a letter on December 8th, so let's use that. There's no evidence that Dr. Penner had any knowledge of this condition before then, and it would have been up to the plaintiff to present evidence of that. But what I'm after is, in the posture of these cases, it's not like this is an ordinary civil case where we've had extensive discovery, both sides have their best shot, they've done all their depositions, and then you put it out on both sides. Mr. Jett has not been able to do much in terms of discovery. What we have, of course, is Dr. Penner saying this, but Mr. Jett has not gotten a lot of sort of, as it were, evidence on his side with which to dispute it. What are we supposed to do with that? Well, Mr. Jett's deposition was taken and he was asked when he first notified Dr. Penner about this, and that's evidence in the record. I know, but you're slipping past the question I have is, there were other things that Jett did between his return from the emergency room and his letter to Dr. Penner, and what I'm trying to figure out is how likely is it in the ordinary course of business that Dr. Penner would have seen those, and the answer is I don't know. Well, I don't think that creates a triable issue of fact, with all due respect. It's up to the plaintiff to present evidence that Dr. Penner actually had knowledge of those, and there is no evidence of that until a letter is written on December 8th. He was asked the questions in his deposition, when did Dr. Penner first know about this, and he wasn't able to narrow that down. So it's undisputed, according to the record, that the first date of knowledge about Mr. Jett's condition would have been December 8th. Why did he write the letter on December 8th? Pardon me? Why did he write the letter on December 8th? Well, you'll have to ask Mr. Jett. I don't know why he wrote that letter except that his medical slips were not being answered. So he just knew to write a letter to Dr. Penner? Well, it's undisputed that Dr. Penner had never seen him before December 24th, so I don't know how he got Dr. Penner's name. And no evidence was presented at that point by the appellant. Didn't he, in fact, say that he was encouraged to do that by one of the medical assistants in the infirmary? According to Mr. Jett's testimony, he was told to file a 602 appeal, which he did on December 11th. So if he found out about Dr. Penner's name, it would have been within that period of time. You have a December 8th letter and then a 602 on December 11th. What do you make of counsel's assertions that Dr. Penner's involvement, his notations in the file, the difference of opinion on the X-ray findings, all indicate that he was simply indifferent to the pain and suffering that this individual is experiencing? And you don't dispute the pain and suffering, right? Well, I disagree with the medical evidence, absolutely. Appellant has cherry-picked words out of radiologists' reports. The first X-ray taken on December 27th says the fracture is healing. Deformity and slight angulation is stable. The next X-ray that's taken says there's no dislocation or significant subluxation seen. The fracture is well healed. Now, these aren't just words I'm picking out of a radiologist's report. And the radiologist is a different doctor from Dr. Penner. Well, the ultimate result is this gentleman needed surgery to correct this. Isn't that right? Well, unfortunately, there's no record, there's no evidence in the record that he required surgery. The specialists that saw him referred him out to determine whether or not he did need surgery in the end. But the record before the court is that they referred him out to see whether he would need surgery. So the issue in this case is did Dr. Penner exhibit deliberate indifference by not referring this man back to an orthopedic consultation within a week of October 27th? And Dr. Penner wouldn't have been able to do that because he didn't even know about the appellant's condition until at least December 8th. Okay, but here's your basic problem. We have a man who falls out of his bunk on October 27th, Saturday, 2001. He is taken to the emergency room. The sum can't be reset because of the swelling. It is never reset. It is healing in its displaced form. I'm not a medical doctor, so I can't give you all of the phraseology that I get out of the reports. And because it was never reset, we have severe pain, long-lasting injury. Nobody ever did anything to set that. And the question is, who's responsible for that? Was it deliberate indifference? Was it merely negligence? You can't possibly defend on the ground that this was adequate care. You can only defend on the ground that, well, it was not deliberately inadequate care. That's correct, Your Honor, and the evidence is such that Mr. Jett was seen by a Dr. Hooper at the prison facility on December 31st. Dr. Hooper didn't refer him back to an orthopedic consultation. He was also seen by Dr. Jett. He had radiology reports. So your argument is that we should add Dr. Hooper as a defendant? I'm not arguing that at all, but if there was any doctor who could have sent the appellant back within a week of that visit, it would have been that doctor, not Dr. Penner. But that doctor is not a party to this action for whatever reason. Ms. Woodbridge, I want to ask you a question about the claim under Government Code 845.6, which provides that states liable if the employee has reason to know that a prisoner is in need of immediate care but fails to take reasonable action to summon the care, right? That's the provision. And the magistrate judge found that the record reflects that the gravamen of the plaintiff's claim centers on the adequacy of treatment, not the failure to obtain medical care. But see, that to me seems to assume that the duty under 845.6 can arise only once in every case. It seems to me here there was a duty for immediate medical care to summon action at the time he had the action when he fell out of his bunk. But it seems to me also because the fracture could not be reset at that time because of the swelling that it's possible that at a later time the duty arose again to summon medical care to reset the fracture, and that medical care was not summoned. Now, what's your response to that kind of assertion? I understand your position. There was immediate medical care summoned, as you've noted, by sending him out to the emergency room. But he received care on numerous occasions at the prison facility. Well, I don't know. You equate, you know, an examination, an x-ray with care? Well, he was also sent to an orthopedist in April. That was Dr. Fong. And let me see if I can find the reference on the record for you. It's 25. Let me see. And Fong says he needs care, right? That's Dr. Fong, and he refers him to a hand specialist, and then he's seen by Dr. Tangi, who then refers him out to another specialist. So all the reports say he needs care, but he's never given that care. So doesn't it inference arise that that care was never summoned? I'm out of time. That's all right. No, go ahead. Okay. The discharge instruction was to send him for an orthopedic follow-up, which was done, and that was Dr. Fong at the Manteca facility. And then Dr. Fong referred him out to another specialist, who was Dr. Tangi, and then apparently Dr. Tangi referred him out to another specialist. So, you know, to say that he didn't receive any care is not true at all. All these specialists referred him to other specialists, and therefore, I don't believe you can support a claim under the Government Code section, because he did receive care. Okay. Thanks very much. Response? Yes, Your Honors. I'd like to make just two brief points. First of all, Dr. Penner was Mr. Jett's doctor. The record supports that. The record shows that ---- What do you mean when you say he was Mr. Jett's doctor? What does that mean? It means that the record shows that if anyone was responsible for Mr. Jett's care, it was Dr. Penner. That's a conclusion. Yes, it is a conclusion, Your Honor. It's a conclusion that I think the Court should have drawn from the record, because at summary judgment, Mr. Jett was entitled to that inference. And I think Your Honor asked how we know that Dr. Penner should have been aware of these medical slips early on, and this is part of the answer. He was the one responsible for Mr. Jett's care, according to the record. And the record shows that the day of Mr. Jett's injury, the aftercare instructions saying that Mr. Jett must return for an orthopedic visit was given to the prison infirmary, and that a medical assistant told Mr. Jett that Dr. Penner specifically by name was aware of Mr. Jett's condition. So these facts I think support that Dr. Penner was his doctor and was aware of his condition and should have taken steps. The second is that there's a dispute of fact is what the radiology reports show. I'd like to conclude briefly. Your Honors, Mr. Jett was a prisoner litigating his case pro se. Despite these sort of twin disabilities, he adduced enough evidence to support a jury finding that Drs. Penner and Peterson and Warden Plyler were indifferent to his medical needs. Now, I want to take a step back and remind the Court that he's not asking for the best care that's available in the State of California. All he's asking, Mr. Jett is asking, is that he not be forced to endure a broken bone that heals crooked, three years of pain, and the inability to button his clothes because the defendants are indifferent to his needs. He's entitled to that much under the Constitution, and the trial court erred in dismissing his case and it should be reversed. One last question, if you don't mind my holding you over. At what point does Mr. Jett get representation? On appeal, Your Honor. Only on appeal? Only on appeal. Thank you, Your Honor. Thank both of you for your arguments. The case of Jett v. Penner is now submitted for decision.
judges: Tashima, W. Fletcher, Shea